United States District Court
Southern District of Texas

**ENTERED**

April 17, 2026

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LESTER WOODS, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-CV-03611 |
| | § | |
| JOHNSON CONSTRUCTION | § | |
| CLEARING LLC, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Pending before the Court is Defendant Johnson Construction Clearing, LLC's ("JCC," or "Defendant") Motion for Summary Judgment. (Doc. No. 15). Plaintiff Lester Woods, Jr. ("Woods," or "Plaintiff") filed a response, (Doc. No. 19), and Defendant replied, (Doc. No. 20). Having reviewed these documents, the record, and the applicable law, the Court hereby GRANTS Defendant's Motion for Summary Judgment. (Doc. No. 15).

## BACKGROUND

This is a race discrimination suit arising out of Lester Woods' termination in late 2022. In 2013, Johnson Construction Clearing, LLC, headed by its founders Michael Johnson and Tresha Johnson, hired Woods as a truck driver. (Doc. No. 15-1 at 17:2-20; 121:15–22) (Lester Woods' Deposition). Woods started his employment with JCC in August 2013. (*Id.* at 121:15–22). Woods is an African American. (*Id.* at 49:9–12); *see* (Doc. No. 19-1) (Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination where Woods states "I am African-American").

As a truck driver, Woods worked with different "crews" based on the particular job he was assigned to. (Doc. No. 15-1 at 19:20–25). Woods reported to the supervisor or superintendent of the crew he worked with, including Troy Whitmire, Taylor Grider, and Scott Hayes. (*Id.* at 20:1–21:24; 25:3–10). While Woods worked on a particular job for Hayes, Hayes had authority over him. (*Id.* at 23:15–17). Hayes testified that Woods was the only African American employee he'd supervised at JCC. (Doc. No. 15-3 at 9:7–10) (Scott Hayes' Deposition). During the time Woods worked under Hayes, Hayes never wrote up or disciplined Woods for any misconduct. (*Id.* at 51:4–11).

## I.    The Days Prior to Woods' Termination

In the last week of Woods' employment with JCC,  Hayes' crew, including Woods, was asked to move south to help another crew in Atoka, Oklahoma. (Doc. No. 15-3 at 30:6–10). Hayes testified that he asked Woods to "haul two machines" and his camper from Texarkana to Atoka in a two-day period. (*Id.* at 31:8–14). Woods testified that he moved the two pieces of equipment on a certain Thursday and Friday (he could not recall the specific days) to Atoka. (Doc. No. 15-1 at 77:20–79:12). On that Friday, after taking the second piece of equipment, Woods returned to Texarkana. (*Id.* at 79:10–12). On Saturday morning, Woods drove home to Carrollton from Texarkana without his camper because he had been told that a supervisor, Taylor Grider, would be able to drive his camper to South Texas, the location of the next job, while Woods drove the company's dump truck down. (*Id.* at 79:18–80:17).

Woods, however, received a call in which he was informed that Grider would not be able to do so. Consequently, Woods drove back to the Texarkana job site to get his camper on Saturday and then returned home. (*Id.* at 80:14–81:1). On Monday, Woods drove his camper down to the

job site in South Texas. (*Id.* at 80:23–81:1). Woods then drove back up toward Texarkana that same day to retrieve the company's dump truck, stopping at his home about halfway to sleep for the night. (*Id.* at 81:23–24, 82:2–6). On Tuesday, he retrieved the company's dump truck from Texarkana and returned to South Texas. (*Id.* at 82:2–6). That was the last day Woods performed work for JCC. (*Id.* at 82:23–25). Around the time when Woods was driving the dump truck to South Texas, he received a call that his mother-in-law was in hospice; so he proceeded to take the rest of the week off, returning home to Carrollton after dropping the dump truck off. (*Id.* at 82:9–22).

When Woods turned in his travel time to Hayes for these days, Hayes testified that Woods included time accounting for his travel home and JCC "does not pay to drive home." (Doc. No. 15-3 at 34:12–36:12). On November 3, 2022, Hayes called Woods and told him that he may not get paid for that time, but said that he would call the company's office and ask. (*Id.* at 38:24–39:2); (Doc. No. 15-1 at 71:4–6, 110:16–19). Woods then proceeded to call the office himself that same day to go over his hours and find out why he could not get paid for the time he spent driving his camper from the campsite to his home. (Doc. No. 15-1 at 65:6–10; 67:4–9); (Doc. No. 15-4 at 13:13–15) (Sarah Cox's Deposition). Woods spoke to Sarah Cox, who handles "accounts receivable, estimating," and "the tracking of . . . employee hours" in JCC's office. (Doc. No. 15-4 at 7:2–5).

The parties dispute the details of Woods' calls to Cox, including how many times Woods called, the contents of the calls, and Woods' tone in the calls. *See* (Doc. No. 15-1 at 62:11–23) (Woods testified he called "no more than two" times); (Doc. No. 15-4 at 15:3–22:10) (Cox testified Woods called her four times). After Woods spoke with Cox in the JCC office, Hayes called Woods

3

again to inform him that JCC would not pay for his travel time driving home with his camper. (Doc. No. 15-3 at 41:4–11). Woods hung up on him. (*Id.* at 41:7–9); (Doc. No. 15-1 at 59:1–4). Hayes tried to call Woods back twice that day, but Woods did not answer. (Doc. No. 15-3 at 41:9–10); (Doc. No. 15-1 at 60:25–61:15). Hayes testified that he thought, based on this incident, that Woods had quit. (Doc. No. 15-3 at 41:14–17).

On November 6, 2022, Hayes texted Woods: "They'll [sic] be no need for you to drive in if you can't take five minutes to call and talk to your supervisor far as I'm concerned you no longer work for Johnson construction." (Doc. No. 15-1 at 111:1–5); (Doc. No. 19-2) (Screenshot of Hayes' text message). Woods called Hayes back that day and Hayes informed him that he was terminating him for "insubordination." (Doc. No. 15-1 at 56:13–20; 111:11–22); (Doc. No. 15-3 at 42:9–18).

Woods then called Johnson to find out why he had been terminated. (Doc. No. 15-1 at 86:22–24). Johnson explained some of the story he'd gotten from Hayes and Woods confirmed that he had hung up on Hayes and that Hayes had not "cussed" at him on the call. (*Id.* at 87:3–19). Johnson testified that he told Woods that he needed to talk to Hayes to get further information about the situation and Woods was released from work until the following Monday. (Doc. No. 15-2 at 29:6–12) (Michael Johnson's Deposition). Woods stated in his EEOC Charge that he was officially terminated on November 12, 2022. (Doc. No. 19-1). The parties dispute why Woods was terminated and who ultimately terminated his employment. *See* (Doc. No. 19 at 4–7).

Woods filed his Complaint here asserting claims against JCC for (1) racial discrimination under Title VII of the Civil Rights Act of 1964; and (2) racial discrimination under the Texas

Commission on Human Rights Act ("TCHRA"). (Doc. No. 1 at 3–5). Subsequently, JCC filed its Motion for Summary Judgment. (Doc. No. 15).

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## ANALYSIS

Plaintiff attempts to prove his racial discrimination claim by indirect (circumstantial) evidence. When a claim involves circumstantial evidence, courts utilize the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In *McDonnell Douglas*, the Supreme Court outlined a three-part framework to analyze a discrimination claim. First, the plaintiff must establish a *prima facie* case of discrimination. *Id.* If the plaintiff does so, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer provides a legitimate, nondiscriminatory reason for the employee's rejection, the burden shifts back to the plaintiff to prove that the employer's reason was pretext for discrimination. *Id.* at 804–05.

For purposes of this Motion, Defendant assumes Plaintiff has stated a *prima facie* case of discrimination and instead focuses its attack on Plaintiff's inability to establish a genuine issue of material fact regarding Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination. (Doc. No. 15 at 14). Defendant contends that Plaintiff has no evidence of pretext and, therefore, summary judgment should be granted on Plaintiff's discrimination claim.[1]

---

[1] The Court notes that Plaintiff's Complaint includes a racial discrimination claim under both Title VII of the Civil Rights Act of 1964 and the TCHRA. *See* (Doc. No. 1 at 3–5). Defendant's Motion, however, asks that judgment be granted in favor of Defendant "on Woods' sole claim for discrimination under Title VII." (Doc. No. 15 at 20). Plaintiff's Response similarly does not address the TCHRA claim. *See* (Doc. No. 19). "The analysis for a race discrimination claim under the TCHRA, [however], is generally the same as that under Title VII." *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 738 (S.D. Tex. 2014) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia,* 372 S.W.3d 629, 633–34 (Tex.2012) ("Because one of the purposes of the TCHRA is to 'provide for execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA.")); *see also Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) (same). Accordingly, the Court treats Defendant's Motion as addressing Plaintiff's discrimination claims under both Title VII and the TCHRA.

6

## I.    Defendant's Legitimate, Nondiscriminatory Reason

Defendant maintains that Plaintiff was terminated due to insubordination. *See* (Doc. No. 15 at 14); (Doc. No. 20 at 2–3). Specifically, Plaintiff (1) hung up on his supervisor, Hayes; (2) ignored Hayes' subsequent calls; (3) called Cox to "ask about his hours even though Hayes had already told him the decision was made;" and (4) "called around looking to move to a new crew, which Johnson precludes." (Doc. No. 15 at 14). In Response, Plaintiff contends that Defendant has not established a legitimate, nondiscriminatory reason for terminating Plaintiff because it has failed to "produce evidence of who actually made the decision to terminate Woods, and the reasons that individual decided to terminate him." (Doc. No. 19 at 11). Thus, Plaintiff alleges, Defendant has not provided a "snapshot" of its reasoning "at the moment of the alleged discriminatory act." (*Id.* at 9–11). Plaintiff argues that "three different people claim to have made the decision to terminate Woods, for varying reasons" and, thus, Defendant has not articulated a nondiscriminatory reason with "sufficient clarity." (*Id.* at 9).

The Court disagrees. First, three different people do not "claim to have made the decision" to terminate Plaintiff, but rather three different people at JCC were involved in the decision to terminate Plaintiff. As Defendant lays out in its Reply, three individuals at JCC played a role in terminating Plaintiff:

- First, Hayes fired Woods on November 6, 2022;

- Second, Woods appealed the termination decision to Johnson who investigated and met with his management team; [and]

- Third, Johnson concluded Woods should be terminated and instructed [Bruce] Stewart to tell Woods his services were no longer needed.

(Doc. No. 19 at 3); *see* (Doc. No. 15-3 at 42:9–18); (Doc. No. 15-2 at 29:6–12, 35:3–36:3, 37:21–38:1); (Doc. No. 15-4 at 27:11–23). The facts surrounding Plaintiff's termination are clear—Hayes, Plaintiff's supervisor, initially told Plaintiff he was fired for insubordination; Johnson, JCC's owner, then investigated the issues surrounding Plaintiff's termination after Plaintiff called him about it; once he completed his investigation, Johnson told Stewart, JCC's "safety director," to call Plaintiff and inform him he was terminated. Thus, Plaintiff's immediate supervisor and the owner of JCC essentially made the decision to terminate Plaintiff, and Stewart was merely asked to make the final call officially ending Plaintiff's employment.

Additionally, Defendant has continually maintained that it terminated Plaintiff for insubordination. While Plaintiff's insubordination may have taken "on various forms and a series of bad decisions directed at multiple people," all of these acts culminated in Plaintiff's termination. (Doc. No. 19 at 3). Specifically, in response to Plaintiff's EEOC Charge of Discrimination, Stewart provided an Unsworn Declaration listing some of the actions in Plaintiff's "pattern of insubordination:"

a.  A false report by Woods to one of JCC's owners regarding his pre-payment of personal RV park rent and request that JCC [] pay for Woods' upcoming rent expenses as reimbursement for the pre-payment.

b.  Woods did not follow Hayes' specific instructions about hauling equipment to a new job location between October 28 through November 2, 2022. Woods [sic] disobeying of Hayes' instructions resulted in Woods billing several hours of his personal errands to JCC.

c.  Woods was rude and combative to one of JCC's office administrators on the phone regarding the billing issues from October 28 through November 2, 2022.

d.  Woods raised his voice to Hayes and eventually hung up on him when Hayes called to discuss Woods' behavior on the phone with JCC's administrator and the issues with Woods billing his personal time to JCC.

8

e.      Woods [sic] refusal to communicate with Hayes and Woods' communications outside of his chain of command to other supervisors to complain about Hayes and the issue with the billing of personal time to JCC.

(Doc. No. 19-7 at 6). While Plaintiff disputes some of the details of these actions, Defendant's burden is one of mere "production, not persuasion; it 'can involve no credibility assessment.'" *McDonald N. v. Gen. Plastics & Composites, L.P.*, 2019 WL 3549895, at *6 (S.D. Tex. Aug. 2, 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

Accordingly, since Defendant has not only produced evidence of the individuals at JCC involved with terminating Plaintiff, but also the list of actions supporting Defendant's reason for terminating Plaintiff—insubordination—Defendant has met its burden to offer a legitimate, nondiscriminatory reason for terminating Plaintiff.

**II.      Defendant's Alleged Pretext for Discrimination**

Finding that Defendant offered a legitimate, nondiscriminatory explanation for terminating Plaintiff, the burden shifts to Plaintiff to show that Defendant's reason was pretext for discrimination. "In conducting a pretext analysis, the court does not 'engage in second-guessing of an employer's business decisions.'" *Roberson-King v. Louisiana Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't. of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)). A plaintiff may establish pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). "At the end of the day, the pretext inquiry asks whether there is sufficient evidence 'demonstrating the falsity of the employer's explanation, taken together with the prima facie case,'

9

to allow the jury to find that discrimination was the but-for cause of the termination." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015).

### a. Inconsistencies in Defendant's Reasoning

First, Plaintiff argues that "inconsistencies in Defendant's articulated reason support a finding of pretext." (Doc. No. 19 at 11). Plaintiff avers that the "testimony of the three purported decisionmakers is rife with inconsistencies," pointing to differences in testimony between Stewart, Hayes, and Johnson regarding Plaintiff's alleged insubordinate actions. *See* (*id.* at 11–13). Additionally, Plaintiff disputes some of Defendant's proffered evidence for Plaintiff's insubordination, arguing that the evidence indicates (1) Plaintiff was told not to return Hayes' calls; (2) Plaintiff only called Cox two times; and (3) Plaintiff was not "insubordinate" in discussing his concerns about payment with a supervisor other than Hayes as Johnson previously instructed him he could do so. *See* (*id.* at 12–13). Plaintiff alleges that "[t]hese inconsistencies, in combination with additional evidence of pretext . . ., require the denial of JCC's Motion." (*Id.* at 13).

The alleged inconsistencies in the reasons provided by Defendant for Plaintiff's termination, however, do raise an issue of material fact as to pretext. While the three individuals involved in Plaintiff's termination—Hayes, Johnson, and Stewart—provide slightly different testimony regarding Plaintiff's "insubordinate" actions, *compare* (Doc. No. 19-7 at 6) (Stewart points to a "false report" regarding payment of RV park rent and Plaintiff "rais[ing] his voice to Hayes") *with* (Doc. No. 15-2 at 31:1–32:19) (Johnson only testified that Plaintiff's termination was 20% caused by Plaintiff's conversation with Hayes, 10% caused by Plaintiff calling other supervisors discussing his concerns, and 70% caused by Plaintiff calling Cox four times in one

10

day), the totality of these actions culminated in Defendant terminating Plaintiff for one particular reason: insubordination. As the Fifth Circuit held in *Braymiller*, all of these "justifications . . . concern[] the same events." *Braymiller v. Lowe's Home Centers Inc.*, 325 F. App'x 311, 314 (5th Cir. 2009). "Varying explanations are not necessarily inconsistent." *Id.* The motivating factor for Plaintiff's termination remains the same: insubordination.

Further, while Plaintiff provides evidence to dispute some of the alleged "insubordinate" actions, *see, e.g.*, (Doc. No. 15-1 at 60:15-22) (Plaintiff testified that he failed to return Hayes' calls because the superintendent told him to "give Scott some time to cool off."); (Doc. No. 19-5 at lines 256, 258) (phone records showing two calls from Plaintiff to the JCC office number); (Doc. No. 19-3 at ¶ 6) (Declaration of Lester Woods) (testifying that "Mr. Johnson had told [him] and other employees during meetings to contact Mr. Whitmire [a supervisor] first about any issues going on on the job."), this evidence does not demonstrate that Defendant's termination of Plaintiff was actually discriminatory. Indeed, "[a]n employer's decision may be legitimate even if it is unreasonable or based on an incorrect belief as long as it is not discriminatory." *Fan Gu v. INVISTA S.a.r.l.*, 2016 WL 9022583, at *2 (S.D. Tex. Apr. 29, 2016), *aff'd sub nom. Gu v. INVISTA S.a.r.l.*, 682 F. App'x 316 (5th Cir. 2017) (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.")).

Accordingly, the Court finds that Plaintiff has not adequately raised a dispute of material fact that Defendant's reason for terminating Plaintiff for his insubordination was pretext for discrimination based on alleged inconsistencies in Defendant's evidence.

b. *Similarly Situated Non-Black Employees*

Second, Plaintiff contends that he has provided evidence of two similarly situated non-Black comparators who were not similarly fired, though they engaged in nearly identical behavior. (Doc. No. 19 at 13). Plaintiff essentially argues that since "the various decisionmakers' reasons for firing Woods were inconsistent," in this regard Plaintiff focuses on "the phone call between Woods and Hayes as the common denominator." (*Id.*). Plaintiff maintains that two similarly situated non-Black employees—Brent McCullough and Reese Ford—"yelled at Scott Hayes in a manner far more disrespectful and insubordinate than anything Woods was accused of doing but were not disciplined or terminated for their behavior." (*Id.* at 14).

An employee who proffers another employee as a comparator must "demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (citing *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir.1991)). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.*

Even assuming that Plaintiff, McCullough, and Ford held the same job (driver), shared the same supervisor (Hayes), and had "essentially comparable violation histories," Plaintiff's argument fails. *Id.* Plaintiff testifies that McCullough and Ford each got into separate yelling matches with Hayes during their employment. *See* (Doc. No. 19 at 14–16); (Doc. No. 19-3 at 1–

2). Plaintiff contends that their behavior was "far more 'insubordinate' than anything Woods did," and yet they did not face any disciplinary action. (Doc. No. 19 at 16). As such, Plaintiff argues, this is evidence of Plaintiff being treated less favorably than similarly situated, white employees.

This argument, however, completely ignores all the other evidence provided by Defendant evincing Plaintiff's insubordination—i.e., Plaintiff's alleged "false report" regarding his pre-payment of the RV park rent; the alleged failure to follow Hayes' instructions regarding hauling equipment to Oklahoma; the alleged multiple calls to JCC's office administrators; the alleged refusal to communicate with Hayes; and the alleged communications with other supervisors regarding Plaintiff's complaints about payment. *See* (Doc. No. 19-7 at 6). "[C]ritically," Plaintiff's conduct that drew his termination is *not* "nearly identical" to that of McCullough and Ford, who allegedly got into singular yelling matches with Hayes. *Lee*, 574 F.3d at 260. Since the difference between Plaintiff's conduct and that of McCullough and Ford's may account for the difference in treatment from JCC, McCullough and Ford are *not* similarly situated for the purposes of Plaintiff's discrimination claim. *See id.*

Accordingly, Plaintiff has not provided sufficient evidence of a dispute of fact regarding differential treatment of similarly situated employees, meaning this argument for pretext likewise fails.

    *c.  Other Evidence of Racial Bias*

Lastly, Plaintiff avers that Hayes' lack of response to McCullough's previous use of the "N-word" when telling a story "speak[s] to his racial basis." (Doc. No. 19 at 17). Plaintiff argues that "Hayes' response points to a broader picture of how he treated non-white employees differently from how he treated white ones." (*Id.*). He further points to his testimony that Hayes

13

required Woods and other non-white employees to do "manual labor" while McCullough, a white employee, was not required to do so, *see* (Doc. No. 15-1 at 41:1–14), arguing that based on this, "along with JCC's almost complete lack of Black employees . . . and the other evidence of pretext, a reasonable jury could find that Woods would not have been terminated from his position at JCC had he not been Black." (Doc. No. 19 at 17–18).

This evidence does not support the argument that Defendant's reason for terminating Plaintiff was pretext for discrimination. Hayes' lack of response to an alleged racial slur from an employee is not appropriately tied to Defendant's decision to terminate Plaintiff; nor is any allegation that Hayes had Plaintiff, and other non-white employees, do manual labor. As Defendant points out, "'statements [or non-statements] by decision makers unrelated to the decisional process [to terminate an employee] do not suffice to satisfy the Plaintiff's burden' of showing discriminatory intent." *York v. Ezell*, 2025 WL 1577822, at *4 (5th Cir. June 4, 2025), *cert. denied sub nom. York v. Kupor*, 146 S. Ct. 825 (2025) (quoting *Lavigne v. Cajun Deep Founds., L.L.C.*, 654 F. App'x 640, 647 (5th Cir. 2016) (per curiam)). This unrelated, alleged evidence of racial bias does not show that "a discriminatory reason motivated management" to terminate Plaintiff or that "the reasons given for management's actions are simply not believable." *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001).

Accordingly, Plaintiff has not raised a dispute of fact that Defendant's reasoning was pretext for discrimination based on this other alleged evidence of racial bias. Plaintiff, therefore, has not adequately raised a material dispute of fact through summary judgment evidence that Defendant's reason for terminating him for his insubordination was pretext for racial

discrimination. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's

discrimination claims.[2]

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in

its entirety, and all of Plaintiff's claims are DISMISSED with prejudice. A Final Judgment will be

entered separately.

Signed on this the __17__ day of April 2026.

Andrew S. Hanen
United States District Judge

---

[2] Defendant also argues in its Motion that Plaintiff's race discrimination claim fails under the "same-actor rule" that "when the person who hires the plaintiff later decides to fire him, there is an inference that discrimination was not the motive behind the termination." (Doc. No. 15 at 18) (citing *Boutin v. Exxon Mobil Corp.*, 730 F. Supp. 2d 660, 675–76 (S.D. Tex. 2010)). The Court, however, need not address this for the purposes of this order since Plaintiff fails to establish a fact issue as to any pretext for Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff.